v. Gelb, case number 241917. May it please the court, my name is Mark Sullivan, appellant pro se. Your honors, thank you for hearing this matter and I respectfully accept your oaths of office. Your honors, all of this is my instrument, my voice, the lone tool with which I made my living performing with the Metropolitan Opera Chorus, the most sought after tenured choral position in the world. The defendants attempted to compel me to subject my instrument to a medical intervention with known potential harms, all of which could permanently disable my voice. The defendants knew that permanent disability and even death were risks associated with this intervention, but without any assumption of liability for those risks, they gave me an impossible choice, either assume all liability myself and risk my instrument and my life or lose my career. Plaintiffs never disputed that the defendants could create a COVID safety policy. However, the lower court overlooked material facts which clearly reflect that this policy's terms are neither contractually binding nor enforceable under plaintiff's collective bargaining agreement. The terms of this policy are the product of the most egregious breakdown of union and employer relations that could ever be imagined. I ask this court to consider, did the lower court err by failing to consider plaintiff's claim that there is no court precedent holding that union and employer representatives can create and enforce a policy with terms that dictate an employee be subjected to severe known risks at his own cost that would permanently alter his body outside the workplace without his consent and without any disclosure of contractual or statutory obligation to comply with those terms? Further, did the lower court err by dismissing plaintiff's claim that this is a novel and complex issue of law for New York State Court when the lower court's conclusions of law were not and indeed could not be supported with any court precedent? The defendants effectively barred the plaintiff and the Met from fulfilling the terms of plaintiff's already ratified contract by tortiously enforcing the terms of this policy against the plaintiff and compelling him to accept all liability. Nothing in the CBA could possibly substantiate requiring the plaintiff to subject himself to a procedure which could have irreversibly harmed him, ended his career, and potentially cost him his life. Does the record reflect at appendix pages 235 through 309 and again at 315 through 324 that prior to litigation, plaintiffs served the defendants with multiple constructed notices by way of the United States Postal Service, charging them with a duty to disclose any obligation, contractual or otherwise, to comply with the terms of the Met's policy, and asking who would assume liability, financial and otherwise, for the known harms associated with the policy's mandated medical procedures, and that the defendants responded with no obligation, contractual or otherwise, and no assumption of liability for the associated harms before plaintiff's employment was terminated solely for noncompliance with the policy? Did the lower court also err by failing to consider that those responses from the defendants clearly reflect that plaintiff's claims are unrelated to any contractual obligation that would require interpretation, and that no liability was assumed for the known costs arising out of the policy's terms? Further, did the lower court err by failing to rule as a matter of law that the defendant's conduct violated duties arising under New York state law to uphold plaintiff's substantive rights, including his rights to be free from economic harm, fraud, negligent misrepresentations, contractual interference, and his right to be free from subjection to unreasonable risk of harm? Did the lower court also err by failing to consider both of plaintiff's served notices served to defendant Wheeler and the responses from Wheeler, which clearly indicate that there was no contractual obligation for him to comply with the terms of the policy, and that Wheeler was involved with the creation of those terms, which extended off the work site and assigned all of this liability to the plaintiff? Thank you. Thank you very much. Thank you. We'll hear from counsel for Mr. Gelb, Ms. Sells, and Ms. Basta. And you reserved a minute for rebuttal, Mr. Sullivan? Yes, Your Honor. May it please the court? My name is Godfrey Blackman, and I represent appellees Peter Gelb, Marcia Sells, and Stephanie Basta. Each of the appellant's claims is preempted by Section 301 of the Labor Management Relations Act, which confers jurisdiction over suits for violations of contracts between an employer and a labor organization. This preemption applies whether the contract is written or whether the contract is oral, so long as it affects the significant, as long as it is significant to the maintenance of the labor peace between them. So what is it, in your view, that Mr. Sullivan could have done to fight this requirement? He could have filed a grievance, which he did, and he could have pushed that grievance through to arbitration. But here, he refused the union's offer to arbitrate his grievance on his behalf, and instead, he chose to file a lawsuit in state court. Now, with respect to the fraud claim, you argue that it's preempted because it pertains to labor negotiations, if not the collective bargaining agreement. Is that right? Yes, that is correct. Okay, so what's your best case for that proposition? For the fraud proposition? If I may have one moment. I'll note that for the fraud proposition, we cite to Fortune Media, in which a NLRB judge held that pre-return-to-work COVID policies is a mandatory subject of bargaining, and here, the Metropolitan Opera and the union did discuss and bargain over these COVID-19 safety policies. So there were other individuals represented by the union who raised similar concerns about being required to be vaccinated, apart from any religious or medical kind of exemption? I'm not sure on that point. I think perhaps my colleague might be better able to answer that question. Appellant's claims here are preempted for two reasons. First, as district court determined, each arises from and is inextricably intertwined with his rights under the collective bargaining agreement and the other labor agreements between the Metropolitan Opera and AGMA. Second, they are all… Were there any other employees who fought the vaccine requirement? I don't know the answer to that question, but again, I have to assume the answer is yes. So based on the way you just answered, you don't know what happened to the extent that they arbitrated what happened? I do not know to the extent they arbitrated what happened. I think it would depend on the certain circumstances. This policy, there were… You could have requested a religious or medical accommodation for the policy, but here, appellant did not do that. He just refused to engage outright. Sorry to continue. His claims are all based on his unjustified belief that somehow the Metropolitan Opera, his employer, and AGMA, his union, somehow exceeded their authority when they agreed to a workplace safety policy. But as I mentioned, an LRB law judge determined that, in fact, that is a mandatory subject of bargaining, and it is undisputed that the Metropolitan Opera and AGMA did, in their May 11th term sheet, discuss that they would develop a return-to-work COVID-19 policy before resuming any actions inside the Metropolitan Opera, and it's undisputed that, in fact, the union and the employer did agree to these policies before resuming any in-person work. So we'll hear from Mr. Wheeler's counsel. Is that right? Thank you. Good morning, Your Honors. May it please the Court. Olivia Singer from Cohen-Weiss and Simon LLP for Appellee Samuel Wheeler, the union's former Eastern Council and National Executive Director. I would first like to just direct the Court to a case on the fraud preemption claim, Doherty v. American Telephone. I think the facts there are somewhat similar in that, in this case, Mr. Sullivan is essentially arguing in his fraud claim that Mr. Wheeler was not authorized under the collective bargaining agreement to negotiate the policy and omitted his participation in the negotiation. I think it's clear from the way he frames his allegations, knowingly and without contractual authorization in his first amended complaint, violated an already ratified CBA, that the Court would have to look to the CBA to determine whether or not the negotiation was authorized by the CBA, which, in fact, it was. I will also focus on another ground since the appellees, the counsel for the Met Appellees has discussed Section 301 preemption, preemption by the federal duty of fair representation. It was not a ground reached by the Court, but it's an alternate and independent ground for dismissal here. All of the appellant's state law claims are preempted by the duty of fair representation, which is a duty requiring unions to represent all bargaining unit members fairly and in good faith in matters of collective bargaining and contract administration. The duty of fair representation applies to all union contact that affects the relationship between an employee and their employer. And since all of his claims deal with the union's negotiation of workplace policy, quintessential union activity, they are preempted by that duty as well. Thank you. How about statute of limitations? Isn't there a statute of limitations issue? Sorry? Is there a statute of limitations issue? Correct, correct. So Mr. Sullivan asserts that he did not bring a duty of fair representation claim. However, the district court found that on his pleadings he brought forth a duty of fair representation claim. So to the extent that there is one, it would be barred by the statute of limitations because the court found that on October 5th, more than six months before the date that he filed his complaint, he became aware of Mr. Wheeler's participation in the negotiation. Thank you very much. Thank you. Mr. Sullivan. May I ask you a question, Mr. Sullivan? Yes. So you heard about this process of arbitration. Were you aware of the grievance process and the arbitration process? Yes, Your Honor. After my employment was terminated, I did seek out the grievance process. I completed the grievance process, but it was only during the time that I was in the grievance process that I discovered that Defendant Wheeler had been involved intimately with creating the terms of the policy and that the terms of the policy, because they extend outside of the work site permanently and confer liability to the plaintiff, they can't necessarily then fall under Section 301 or even the LMRA, which is restricted solely to workplace conditions, rules. I'm sorry. Can you tell me what is the authority that you think is most useful for the proposition of what you just said? Okay. So, Your Honor, this is the big pink elephant in the room, the liability. There is no court precedent surrounding this issue. There just simply isn't any. That's been brought forth to my knowledge, and the lower court didn't cite any court precedent citing that there was the ability to impose a term or condition of employment. No, no, no, no. The question is why 301 of the Labor Management Relation Act does not preempt your state law claims. Where's the authority for that? I'll try to answer the question to the best of my ability. Sure. I don't think Congress intended for the LMRA to effectively grant individual administrators the authority to run a medical benefit risk analysis on behalf of employees and then compel them to assume all liability for known medical procedures that have permanent effects outside the workplace that, after all, cannot be undone at the end of the workday. So you think the best authority is congressional silence on not affirmatively indicating that. Is that right? I would agree with that. I would agree with that. And you believe there was no exemption that you could faithfully request because it was limited to a religious exemption or a medical exemption that required some kind of preexisting condition. Is that right? I was offered a medical exemption option. I was offered a religious exemption offer, Your Honor. But if the plaintiff had applied for an exemption, would this not create consent to the policy's terms, including the right of the defendants to reject this application? Additionally, since the terms of the policy were  So you're saying if you had applied, you thought you would have been compromising your position in some way. By contract law, I would have consented. That's my understanding. By applying for an exemption, that would have bound me to the policy. I chose not to consent. I chose not to assent to the policy in any way. My choice was to challenge the policy on its face because I was under no contractual obligation with my previously ratified contract to comply with a new policy that went far, far beyond workplace measures. And the LMRA simply could not possibly cover this kind of case, this kind of assertion. We've got, I think, your argument well in hand, well in mind. And we will reserve decisions, so you will all get a decision from us in due course. May I say one more thing? I'll give you 20 seconds. So I also want to bring this court's attention to the fact that the lower court did not, the lower court dismissed my negligent misrepresentation claims, multi-page individual claims against defendants Sells and Gelb, with no reference in the opinion at all to any of those allegations. Thank you, your honors. Thank you very much. We will reserve decisions.